## 28641. MUTUAL LIFE INSURANCE COMPANY OF NEW YORK *v.* CHILDS.

DECIDED MARCH 8, 1941. REHEARING DENIED MARCH 28, 1941.

*Bryan, Middlebrooks & Carter, John G. Kelly, Louis W. Dawson,* for plaintiff.

*Hirsch, Smith & Kilpatrick, Welborn B. Cody,* for defendant.

SUTTON, J. Dr. LeRoy W. Childs filed suit against the Mutual Life Insurance Company of New York, on two contracts of insur-

ance, one dated November 26, 1926, and the other dated March 23, 1929, seeking to recover certain monthly income payments thereon. The suit was in two counts on the two policies of insurance. The plaintiff alleged in each count that he became totally and permanently disabled within the meaning of the policies on April 1, 1939, and sued to recover $1296.40 on one policy and $1200 on the other, these amounts being the accrued benefits for five months on each policy up to the time of filing the suit. He alleged that due proof of his disability had been given to the defendant. The defendant filed an answer in which it denied that the plaintiff was totally and permanently disabled, and denied that he was entitled to recover for total and permanent disability benefits under the terms and provisions of the policies sued on. It was further alleged in the answer that the policies were procured by false and material representations made by the plaintiff as to his previous health and medical history, to induce the defendant to issue the policies; and the defendant denied that it was liable for disability benefits under the policies, because of such material false and fraudulent statements made by the insured in his application for the policies in question. The court, at the beginning of the trial, sustained a motion of counsel for the plaintiff and struck from the defendant's answer all defenses based upon alleged fraud in the procurement of the policies, and held that the defendant was precluded from raising any defense of fraud or material misrepresentations, because of the incontestable clause contained in each of the policies. To this ruling the defendant excepted pendente lite, and assigned error thereon in its bill of exceptions. The jury returned a verdict for the plaintiff in the amount sued for. A motion for new trial was overruled, and the defendant excepted.

■ The first six grounds of the motion for new trial are general, in which it is contended that the verdict and judgment should be set aside, because the evidence failed to show that the plaintiff was totally disabled within the meaning of the policies sued on. The provisions of these policies as to total and permanent disability are as follows: "Disability shall be considered total when there is any impairment of mind or body which continuously renders it impossible for the insured to follow a gainful occupation. Total disability shall, during its continuance, be presumed to be permanent: (a) if such disability is the result of conditions which render it

reasonably certain that such disability will continue during the remaining lifetime of the insured; or, (b) if such disability has existed continuously for ninety days. If, before attaining the age of sixty years and while no premium on this policy is in default, the insured shall furnish to the company due proof that he is totally and permanently disabled, as defined above, the company will grant the following benefits during the remaining lifetime of the insured so long as such disability continues." The amount of the monthly income, in case of total disability, is then specified, and waiver of premiums is provided for during such disability.

The plaintiff was a physician and surgeon. He was born in Ann Arbor, Michigan, in 1882, and located in Atlanta, Georgia, in 1908 for the practice of medicine, where he built up a large and lucrative practice. He was engaged in the practice of his profession there for a period of thirty-one years, and came to be known and recognized as one of the leading surgeons of that section. He retired on April 1, 1939, because of a heart disease, which, it was contended, rendered him totally and permanently disabled, within the meaning of the insurance policies, to continue the practice of his profession. It appears from the evidence that Dr. Childs first had trouble with his heart in 1934. During that year he went to Dr. G. Bachmann, a heart specialist at Emory University, who made an electro-cardiographic test. He continued to make these tests annually for three or four years. He tried to minimize the condition with which Dr. Childs was suffering, but finally had to advise him of the trouble. His diagnosis was angina pectoris with coronary sclerosis as a basis of the attack. Each time he made these tests they showed the same result, except the last one, which showed a more pronounced diseased condition. He testified, that a physician is more easily alarmed about heart trouble than any one else, and for that reason he did not give Dr. Childs a true report as to his condition; that the history of the disease with which Dr. Childs was suffering shows it to be a progressive one, and there is nothing that can be done to arrest the condition; that the patient would have to lead a quiet and careful life, and be particular about his diet, and not subject himself to any unnecessary strain; that a man suffering with that disease should determine what caused it, and then discontinue doing the thing that did cause it; that angina pectoris is a disease common among physicians and surgeons, par-

ticularly those who have followed an active practice, due to the constant strain to which they are subjected; and that in 1936 he advised Dr. Childs to slow up on his activities.

Dr. Jeff L. Richardson testified, that he was called by Dr. J. H. Hines to examine Dr. Childs in reference to his heart condition; that he took a number of electro-cardiograms; that the heart muscles of Dr. Childs were fibrous, and had a lot of scar tissue, which resulted in the hardening of the arteries that supplied the heart with blood, and this resulted in what is known as arteriosclerosis, which in turn resulted in angina pectoris; that this scar tissue was caused by a degeneration of the heart muscles; that Dr. Childs also had myocardial fibrosis, and there was very little that could be done to improve this condition; that at first he did not tell Dr. Childs his true condition because Dr. Hines had asked him not to; that at the time of the first examination Dr. Childs was trying to follow his usual routine practice, but the angina pectoris became, over a period of time, more severe, and it was obvious that he could not carry on with his work, and there seemed to be no halfway ground, so he advised him to quit work entirely; that the seizures of angina pectoris are relieved by taking nitroglycerine, and if such pains are so relieved by that drug, this is definite evidence to a physician that the pains complained of are angina pectoris; and that one attack of angina pectoris often proves fatal.   Dr. Joseph H. Hines testified, that he had known Dr. Childs for a long time; that he first consulted him about his heart condition in 1937; that he recommended that he go to Dr. Jeff Richardson for a cardiographic examination; that he made a very careful examination of Dr. Childs and diagnosed his trouble as angina pectoris, and in addition to this he had coronary sclerosis, myocardial fibrosis, and generalized arteriosclerosis; that he thought that the coronary condition caused the angina pectoris; that he had seen him in attacks of angina pectoris and saw him on two occasions in his home with such attacks; that he knew of his having other attacks when he did not attend him; that in his opinion the emotional strain of Dr. Childs' surgical practice was the cause of his trouble; that he thought it was sound medical advice for a person having angina pectoris to discontinue doing that which caused it; and that he advised Dr. Childs to give up his work and stop his practice, which he finally did, six or eight months later.

Mrs. Guy V. Cotter, secretary and office nurse of Dr. Childs for

fourteen years before his retirement, testified that he had a severe heart attack in his office, early in 1939, and took nitroglycerine at that time. Miss Edythe Turner testified, that she supervised the operating room at St. Joseph's Infirmary, and was well acquainted with Dr. Childs; that she was present on June 28, 1938, when he had a heart attack while operating at St. Joseph's Infirmary; that Dr. Julian Riley had to finish the operation; that Dr. Childs was the chief operator at St. Joseph's Infirmary for many years, but that before he retired on April 1, 1939, his operations there were fewer and fewer. Rosa Palmer testified, that she was the head nurse at Harris Memorial Hospital, and was present when Dr. Childs had a heart attack while performing an operation there early in 1939; that he had to stop the operation; and that he lay down and took nitroglycerine tablets. Dr. Carter Smith, a heart specialist residing in Atlanta, testified that he was engaged by the Mutual Life Insurance Company of New York to examine Dr. Childs; that he made a thorough examination of him in June, 1939, and from that examination he formed the opinion that Dr. Childs was disabled to practice his profession, and that he made a report of his examination to the Mutual Life Insurance Company of New York.

Dr. James E. Paullin, a heart specialist, testified, that he examined Dr. Childs at the instance of the Mutual Life Insurance Company of New York; that he made an electro-cardiogram of his heart and made a thorough examination of him; and that in his opinion Dr. Childs was capable of following his occupation. The examination was made during the latter part of May or early in June, 1939. Dr. E. A. Bancker Jr., a heart specialist, testified that he had not made a physical examination of Dr. Childs, but that he had examined the four cardiograms made by Dr. Richardson, three made by Dr. Bachmann, and one made by Dr. Paullin, and in his opinion the cardiograms did not indicate the presence of any significant degree of coronary sclerosis in Dr. Childs' heart. He testified that, assuming the findings shown by those cardiograms and the physical and x-ray findings, which were stated to him in a hypothetical question, he could state with reasonable medical certainty that Dr. Childs did not have sufficient angina pectoris or coronary sclerosis to keep him from following his profession as a physician and surgeon.

The plaintiff, Dr. Childs, testified that he first began to have

trouble with his heart in 1934, at which time he went to Dr. G. Bachmann, a heart specialist at Emory University, for an electro-cardiographic test; that he continued to have Dr. Bachmann make these tests annually for about four years; that in the spring of 1936 the pain began to get sharper and the heart attacks more frequent, although they were not incapacitating at that time; that on the advice of Dr. Bachmann he quit playing golf, and gave up all out-door activities except skeet shooting which he engaged in for relaxa-tion; that he also curtailed a large part of his professional work, and in 1938 he gave up his work at Grady Hospital, where he was chief of the surgical staff, and discontinued his teaching at Emory University and at St. Joseph's Infirmary; that he curbed his usual activities, and ceased attending medical meetings unless they were of an unusual nature; that he shortened his office hours and elim-inated most of his night calls, and some parts of his work were referred to other physicians; that he took all types of cases when he first commenced to practice medicine, and at one time he did a great deal of examination work for various life-insurance compa-nies; that he had specialized in surgery for a number of years, and had reached the point where ninety-five per cent. of his work con-sisted entirely of surgery; that he and Dr. Julian Riley were part-ners in the practice of medicine, and had been since 1924; that for the last few years that he had practiced the net income from the partnership of Childs & Riley was between $16,000 and $20,000 per year, nothing under that during that period; that the first severe heart attack that he had occurred in June, 1938, while he was performing an operation at St. Joseph's Infirmary; that he was seized with a severe choking pain in his chest, which forced him to discontinue the operation, and he was relieved only by taking nitro-glycerine; that he knew he could not survive many such attacks, and decided to make his plans to discontinue his practice; that he had other attacks after that in his home, and a very severe attack while operating at Harris Memorial Hospital early in 1939; that in his opinion the attacks were brought on by emotional strain in the practice of his profession and especially in his surgical prac-tice; that he enjoyed the practice of his profession; and that it was a source of great regret for him to give it up, but he did give up the work and retired from practice on the advice of his physicians who told him that they would not be responsible for anything that

might happen if he did not; that he was not physically able to carry on his practice as a physician and surgeon, and in his opinion he would never be able to do so; and that he moved to Lake Kerr, Florida, in 1939, where he was living on a forty-acre tract of land about fifteen miles from the nearest town, and was living a very quiet life.

It appears from the evidence, that immediately after Dr. Childs retired from his practice on April 1, 1939, he went to Chicago, where he practiced skeet shooting for two weeks, and then returned to Atlanta and went directly to Sea Island, where he engaged in the Sea Island Gun Club meet on April 20, 21, and 22, 1939; that after he returned to Atlanta he took an automobile trip to Gulfport, Mississippi, and then from Gulfport to New Orleans; that he returned to Atlanta and then went to Jacksonville, Florida, where he participated in the Florida State skeet shoot; that he came back to Atlanta and defended his title as Southern States skeet champion in a skeet shoot at West End Gun Club in Atlanta, and was so engaged for a period of three days; that on August 5, 1939, he married a lady twenty-nine years of age, and then moved to Lake Kerr, Florida, as above stated.

The foregoing is only a brief résumé of the evidence as contained in the voluminous brief of evidence in the record, but in our opinion it is sufficient to show that the jury was authorized to find that Dr. Childs was suffering with a severe heart ailment, angina pectoris, which was progressive in its nature, and which did grow gradually worse until he was finally forced by this trouble to retire from the practice of his profession on April 1, 1939. The policies provide that "Disability shall be considered total when there is any impairment of mind or body which continuously renders it impossible for the insured to follow a gainful occupation." Dr. Childs was not trained or prepared to do any kind of work except to practice medicine. He had been engaged in that occupation for more than thirty years; and he and several other outstanding physicians in this section testified that he was incapacitated and was not able to carry on and continue the practice of his profession, on account of the heart disease with which he was afflicted. In *Cato* v. *Ætna Life Insurance Co.*, 164 *Ga.* 392 (138 S. E. 787), it was held: "Total disability exists when one is wholly disabled from pursuing the usual and customary duties of his employment on which he depends

for a living. When the insured is incapacitated from performing any substantial part of his ordinary duties, a case of total disability is presented, although he is still able to perform some parts of his work. Total disability is inability to do substantially all of the material acts necessary to the transaction of the insured's occupation, in substantially his customary and usual manner. Total disability does not mean absolute physical inability to work at one's occupation, or to pursue some occupation for wages or gain; but it exists if the injury or disease of the insured is such that common care and prudence require him to desist, and he does in fact desist, from transacting his business. In such circumstances total disability exists." Both the Supreme Court and this court have dealt with other cases involving the question of total disability; and without elaboration, we think it is sufficient to say that on an application to the facts of this case of the principles of law as ruled in the *Cato* case, supra, *Prudential Insurance Co.* v. *South,* 179 *Ga.* 653 (177 S. E. 499, 98 A. L. R. 781), *Marchant* v. *New York L. Ins. Co.,* 42 *Ga. App.* 11 (155 S. E. 221), *New York Life Insurance Co.* v. *Oliver,* 45 *Ga. App.* 756 (165 S. E. 840), *New York Life Insurance Co.* v. *Thompson,* 50 *Ga. App.* 413 (178 S. E. 389), and *Prudential Insurance Co. of America* v. *Hicks,* 52 *Ga. App.* 311 (183 S. E. 102), the jury was authorized to find in favor of the plaintiff, and that the court did not err in overruling the motion for new trial on the general grounds.

■ Error is assigned, in grounds 7, 8, 9, and 10 of the motion, on the following excerpts from the charge of the court: "I charge you, gentlemen, that total disability exists when one is wholly disabled from pursuing the usual and customary duties of his employment on which he depends for a living." "If you should find in this case that the plaintiff is incapacitated from performing any substantial part of his ordinary duties, a case of total disability is presented, although he is still able to perform some parts of his work." "So the phrase 'total disability' as used in these policies means inability to do substantially all of the material acts necessary to the transaction of the insured's business or occupation in substantially his customary and usual manner." The plaintiff in error contends, in substance, (1) that the charge in this respect was not sound as an abstract principle of law; (2) that it was contrary to the express language of the policies providing for total-disability

benefits; (3) and was confusing and misleading to the jury, in that it instructed them that the plaintiff might recover for total disability if he was not able to perform all of the duties formerly carried on by him. The court, in charging the jury as to the meaning of total disability as used in the policies sued on, followed the rule as laid down in the *Cato* case, supra. In fact its instruction in this respect was in the same language as that used by the Supreme Court in the *Cato* case. The provisions of the policies as to the total disability, in a number of cases decided by this court and the Supreme Court, are couched in different language, but the same ruling as to the meaning of total disability as used in such contracts of insurance has been consistently followed by the appellate courts of this State since the rule was adopted in the *Cato* case. It was said in *Prudential Insurance Co. v. South,* supra: "The policy here contained language different from that involved in *Cato v. Ætna Life Ins. Co.,* 164 *Ga.* 392 (138 S. E. 787), and the other cases cited by the Court of Appeals; but the purpose of the contract was substantially the same, and the case should be governed by like principles." Also: "The words 'occupation' and 'work' must each be construed according to the facts and circumstances of the execution of the contract, including the objects to be effectuated thereby." Dr. Childs, the insured, had been engaged in the practice of medicine for more than thirty years. He had no other occupation; and the jury was authorized to find from the evidence that he was forced to retire from the practice of his profession, on account of heart trouble. Under the facts, and the principles of law applicable, the court did not err in charging the jury as here complained of by the plaintiff in error.

■ The plaintiff in error contends, in ground 11 of the motion for new trial, that the court erred in admitting in evidence, over objection, four checks issued by the Mutual Life Insurance Company to Pinkerton National Detective Agency and Allen's Commercial Service. These checks were given by the insurance company to the detective agency as compensation for investigating the activities of Dr. Childs, in connection with his claim for disability benefits, and for appearing in court and identifying and explaining certain pictures of Dr. Childs. The objection was that these checks were irrelevant and immaterial. They were produced at the trial under notice from the plaintiff to the defendant. A representative

of the two detective agencies, who had been employed by the insurance company to investigate the activities of Dr. Childs in connection with his claim for disability benefits, was sworn as a witness for the defendant, and testified that he was engaged by the detective agencies to observe Dr. Childs and make a report as to his activities, and to make any pictures that he might be able to obtain; that he took moving pictures of Dr. Childs participating in a skeet shoot at Sea Island; and that he then followed him in Atlanta for two days, and had followed him in Atlanta about the last part of March or the first of April before taking the moving pictures of him in Sea Island. In these circumstances it can not be said that the defendant was harmed by the admission in evidence of the checks which were issued to the detective agency by the defendant.

■ It is alleged in ground 12 that the defendant offered in evidence an application for insurance, signed by Dr. Childs and identified by him as having been written in his own handwriting, to the Pacific Mutual Life Insurance Company of California, dated April 16, 1924, and containing numerous questions and answers. The plaintiff objected to its admission in evidence, on the ground that it was irrelevant and immaterial to any issue in the case. It is contended by the plaintiff in error that the application was admissible in evidence, for the reason that it contained statements by Dr. Childs as to his health and condition at the time of the signing of the application, which statements were directly in conflict with other testimony and statements made by him as to his health, which were introduced in evidence at the time of the trial. Inasmuch as it is not shown in this ground that counsel for the defendant, as was his duty to do, pointed out to the court the portions of the application which it is contended were directly in conflict with other statements made by the plaintiff as to his health, and which were introduced in evidence on the trial of the case, it can not be held that the court erred in rejecting the entire application. *Ellis v. Poe,* 109 *Ga.* 422 (34 S. E. 567); *Bridges* v. *McFarland,* 143 *Ga.* 581 (3) (85 S. E. 856); *Hall* v. *G. S. & F. Ry. Co.,* 144 *Ga.* 145 (2) (86 S. E. 316).

■ In ground 13 the plaintiff in error complains that the court erred in striking all of its defenses based upon fraud or material misrepresentations in the procurement of the contracts of insurance, on the ground that the incontestable clause in the policies pre-

cluded the defendant from making such defense. The policies contained the following clause: "Except for nonpayment of premium and except for the restrictions and provisions applying to the double indemnity and disability benefits as provided in sections 1 and 3, respectively, this policy shall be incontestable after one year from its date of issue, unless the insured dies in such year, in which event it shall be incontestable after two years from its date of issue." It is contended by the insurance company that the incontestable clause expressly excepts from its application the provisions of the policies which relate to disability benefits, and counsel cite numerous authorities from foreign jurisdictions, which they contend sustain the position of the defendant in this respect. The cases so cited dealt with policies of other insurance companies, where the incontestable clauses were different from the one used by the Mutual Life Insurance Company of New York. The form of the incontestable clause used by that company, the one involved in the present case, has been passed on by the Supreme Court of the United States, and by other courts. In Stroehmann v. Mutual Life Insurance Co., 300 U. S. 435 (57 Sup. Ct. 607, 81 L. ed. 732), it was said: "Section 1 (two printed pages) relates to the 'double-indemnity' obligation. It defines the injury to which the insurance applies, specifies the necessary proof, optional modes of settlement, etc. Section 3—'Benefits in event of total and permanent disability before age 60,' is in the margin. It defines total and permanent disability; states when benefits will become effective; what they shall be; when premiums will be waived. Also specifies what will be considered permanent disability; when proofs may be demanded, etc. And provides: 'Disability benefits shall not be granted if disability is the result of self-inflicted injury. The provision for disability benefits shall automatically terminate if the insured shall at any time, voluntarily or involuntarily, engage in military or naval service in time of war outside of the continental limits of the United States of America and the Dominion of Canada.' Other provisions relate to termination of such benefits, reduction of premiums thereafter, etc. Neither § 1 nor § 3 contains anything relative to fraud in obtaining the policy or the effect of false statements in the application. Section 14—'Miscellaneous Provisions' (two pages) contains the following paragraph: 'Incontestability. —Except for nonpayment of premiums and except for the restric-

tions and provisions applying to the double indemnity and disability benefits as provided in sections 1 and 3 respectively, this policy shall be incontestable after one year from its date of issue, unless the insured dies in such year, in which event it shall be incontestable after two years from its date of issue.' . . No reason appears to doubt the power of the insurer to except from the ordinary incontestability clause all policy provisions relating to disability benefits. Ch. 28, Laws N. Y. (1923); Steinberg v. N. Y. Life Ins. Co., 263 N. Y. 45 (188 N. E. 152). But the petitioner maintains that the words used in the policy before us are inadequate definitely to disclose a purpose so to do. And we think the point is well taken. In Mutual Life Insurance Co. v. Hurni Packing Co., 263 U. S. 167, 174 [44 Sup. Ct. 90, 68 L. ed. 235, 31 A. L. R. 102], this court said: 'The rule is settled that in case of ambiguity that construction of the policy will be adopted which is most favorable to the insured. The language employed is that of the company, and it is consistent with both reason and justice that any fair doubt as to the meaning of its own words should be resolved against it.' See Royal Insurance Co. v. Martin, 192 U. S. 149, 162, 165 [24 Sup. Ct. 247, 48 L. ed. 385]; Bergholm v. Peoria Life Ins. Co., 284 U. S. 489, 492 [52 Sup. Ct. 230, 76 L. ed. 416]. Examination of the words relied upon to show an exception to the incontestability clause of the policy discloses ample cause for doubt concerning this meaning. . . Certain life companies undertake to make exceptions to the incontestability clause by words more precise than those now under consideration, and opinions in cases arising upon their policies must be appraised accordingly. Without difficulty respondent could have expressed in plain words the exception for which it now contends. It has failed, we think, so to do. And applying the settled rule, the insured is entitled to the benefit of the resulting doubt."

In Ness v. Mutual Life Insurance Co., 70 Fed. 2d, 59, Mutual Life Insurance Co. v. Markowitz, 78 Fed. 2d, 396, and Mutual Life Insurance Co. v. Margolis, 11 Cal. App. 2d, 382 (53 Pac. 2d, 1017), where the incontestable clauses and sections 1 and 3 in the policies of insurance were identical with those in the Stroehmann case and the ones involved in the present case, it was held that the insurance company was precluded by the incontestable clause from contesting liability for disability benefits on the ground of fraud or misrepresentations in the procurement of the policies. It was said in the

Ness case, supra: "The section 3, relating to disability benefits, begins by defining total and permanent disability. This is followed by a provision that the disability benefits and waiver of premiums shall be granted, if the insured, before attaining the age of sixty and while no premium is in default, shall furnish the company due proof of disability. Then follow a number of general provisions relating to disability benefits, including provisions, that, if upon request of the company the insured should fail to furnish proof of the continuance of disability, no further income payments would be made or premiums waived, that disability benefits would not be granted if the disability should be the result of self-inflicted injury, and that the provision for disability benefits should automatically terminate if the insured should engage in military or naval service outside the continental limits of the United States and Canada. The purpose of the second exception in the incontestability clause was to make clear that, notwithstanding the provisions of that clause, the company reserved the right to rely upon the restrictions and provisions contained in sections 1 and 3. Thus the right was reserved to contest, under section 1, liability for double indemnity in case of suicide or death resulting from military or naval service or from engaging in felony. And the right was reserved to contest, under section 3, claims for disability where due proofs had not been furnished, or where upon request of the company proofs of the continuance of the disability had been refused, or where the disability resulted from self-inflicted injury or from military or naval service beyond the continental limits of the United States and Canada. . . If it had been the intention of the company that the right to contest liability for double indemnity or disability benefits should not be affected by the incontestability clause, it would have been easy enough to use language making that intention clear, as by simply wording the second exception to the incontestability clause to read: 'Except as to liability for double indemnity or disability benefits.' If there were any ambiguity in the language used, it is well settled that it should be resolved in favor of the insured. [Citing.] But there is no ambiguity. The incontestability clause was directed at defenses which might be asserted to the policy. The exception which we are considering was clearly intended to except certain defenses from the operation of that clause; and equally clearly, the defenses so excepted were those enumerated in

the sections to which specific reference was made, i. e., sections 1 and 3. These sections provide the restrictions and provisions under which the promise with respect to double indemnity and disability made in the face of the policy are to be enjoyed. And the second exception in the incontestability clause preserves defenses arising out of these restrictions and provisions against the general effect of the clause. It is to be noted that the exception is, not as to the double indemnity and disability benefits, but as to 'restrictions and provisions applying to the double indemnity and disability benefits.'"

It was also held in the following cases, where the incontestable clauses and provisions were similar to the ones involved in the present case, that the defense of fraud in the procurement was precluded by the incontestable clause: New York Life Insurance Co. v. Kaufman, 78 Fed. 2d, 398; New York Life Insurance Co. v. Yerys, 80 Fed. 2d, 264; Kiriakides v. Equitable Life Assurance Society, 174 S. C. 140 (177 S. E. 40); Wilson v. Equitable Life Insurance Co., 220 Iowa, 321 (262 N. W. 525); Coodley v. New York Life Insurance Co., 9 Cal. 2d, 269 (70 Pac. 2d, 602). There seems to be no Georgia decision on this particular question. But it is conceded by counsel for the plaintiff in error in their brief that if the Stroehmann case, supra, is to be followed, the ruling of the trial court was correct, as the incontestable clause in that case was the same as the one here involved. We find nothing in the provisions of the policies sued on which reserves to the insurance company the right to contest the validity of the policies on the ground of fraud or misrepresentations in their procurement. Sections 1 and 3, referred to in the incontestable clause, do not contain anything with reference to this. This right not having been specifically reserved in the incontestable clause, or in sections 1 and 2 of the policies therein referred to, we think, and so hold, that the proper construction of this incontestable clause is that it precluded the defendant company from making any defense of fraud or material misrepresentations in the procurement of the policies sued on, where the time limit for contesting the policies had expired, as was true in this case. Consequently the court did not err in refusing to allow the defendant to make any defense based on fraud or misrepresentations in procuring the policies.

Furthermore, it may be said with respect to this ground of the

motion that evidence was introduced upon the trial of the case to the effect that, since the pendency of this suit and the filing of the answer thereto by the defendant, the insurance company had collected from Dr. Childs the full amounts of the premiums on both policies here involved. This conduct on the part of the insurance company precluded and estopped it from urging any defense based on fraud or material misrepresentations in the procurement of the policies. *German American Mutual Life Asso.* v. *Farley,* 102 *Ga.* 720 (3), 742, 743 (29 S. E. 615); *Sovereign Camp Woodmen of the World* v. *Bowman,* 40 *Ga. App.* 536 (150 S. E. 436); *Peninsular Casualty Co.* v. *McCloud,* 47 *Ga. App.* 316 (3) (170 S. E. 396); *Sovereign Camp W. O. W.* v. *Lawson,* 52 *Ga. App.* 345 (183 S. E. 137). See *Gibson* v. *Alford,* 161 *Ga.* 672 (132 S. E. 442). The court did not err in overruling the defendant's motion for new trial.

*Judgment affirmed. Stephens, P. J., concurs. Felton, J., dissents from the rulings in divisions 1 and 3 of the opinion, and also from the ruling in the last paragraph of division 5.*