## 29172. METROPOLITAN LIFE INSURANCE COMPANY *v.* JOHNSON.

DECIDED DECEMBER 5, 1941.   REHEARING DENIED DECEMBER 18, 1941.

*Smith, Smith & Bloodworth, Weekes & Candler,* for plaintiff in error.

*John A. Dunaway, Fraser & Irwin,* contra.

STEPHENS, P. J.   Ernest P. Johnson instituted six suits in the civil court of DeKalb County against Metropolitan Life Insurance Company, to recover for disability benefits alleged to be due him under two life policies, each containing a disability clause, for the month of August, 1940, and for a number of preceding months. The defendant generally denied liability.   The defendant's main contention was that the plaintiff, if he had suffered a disability in the past, had recovered therefrom and was not disabled in the terms of the policy, and therefore not entitled to recover in any of the suits.   The six suits were tried together, and a verdict was rendered for the plaintiff in each suit.   The defendant obtained a writ of certiorari in each suit, but only the judgment overruling the certiorari in the suit applying to the August, 1940, disability was appealed to the Court of Appeals.   It was agreed between the parties that the disposition of this case would control the others. It appeared from the evidence that the policy in the particular case under consideration was issued to the plaintiff August 10, 1925, and contained the usual disability clause which provides that, after providing for the method of proof etc., where the insured has "become totally and permanently disabled as the result of bodily injury or disease occurring and originating after the issuance of said policy, so as to be prevented thereby from engaging in any occupation and performing any work for compensation or profit, and that such disability has already continued uninterrupted for a period of at least three months," the company will pay to the insured a monthly income of $10 per $1000 of insurance, etc.   It further appeared that the plaintiff, who had been operating and working in a grocery store, had ceased such work about 1928; that

he had suffered from tuberculosis, and that the company, upon proof satisfactory to itself, had paid to the plaintiff such benefits until the last of the year 1936, when the company ceased to pay benefits and also afterwards exacted premiums of the plaintiff; that about the time when the company ceased to pay the benefits the plaintiff became associated with the Elks Club in Decatur and began drawing $100 a month; that afterwards the plaintiff instituted suits against the company in which he alleged that he had a continuous disability and was entitled to the benefits under the policies, and sought to recover such benefits and premiums which had been paid. It appeared that some of these suits resulted in favor of the plaintiff and that the company, satisfactorily to the plaintiff, settled all of such suits, but refused to pay any further benefits. For subsequently accruing alleged benefits the plaintiff has instituted the six suits hereinbefore referred to of which the present suit is one.

As has been held by the Supreme Court of this State, in *Cato* v. *Ætna Life Insurance Co.,* 164 *Ga.* 392, 398 (138 S. E. 787), and *Prudential Insurance Co.* v. *South,* 179 *Ga.* 653 (177 S. E. 499, 98 A. L. R. 781): "Total disability exists when one is wholly disabled from pursuing the usual and customary duties of his employment on which he must depend for a living. . . 'Total disability' is inability to do substantially all of the material acts necessary to the transaction of the insured's . . occupation, in substantially his customary and usual manner." "If the insured is so incapacitated that substantially all of the material activities of any such employment are reasonably closed to him, he is totally disabled within the meaning of the policy." See *Wheeler* v. *Fidelity &c. Insurance Co.,* 129 *Ga.* 237 (58 S. E. 709); *Guardian Life Insurance Co.* v. *Snow,* 51 *Ga. App.* 280 (180 S. E. 241); *Metropolitan Life Insurance Co.* v. *Daniel,* 61 *Ga. App.* 90, 93 (5 S. E. 2d, 681); *New York Life Insurance Co.* v. *Howard,* 63 *Ga. App.* 865, 869 (12 S. E. 2d, 394). Therefore, if the evidence was sufficient to authorize the jury to find that the plaintiff, since the issuance of the policy and during the periods covered in the six suits referred to, and in August, 1940, and several preceding months thereto, had become so incapacitated that he could not do "substantially all of the material activities" of his employment, which was that of operating and working in a grocery store, or duties of a similar nature, he was entitled to recover.

It appears from the evidence that sometime previous to the periods covered by the suits involved in this case, and before the company began to pay him the disabilities which it paid him, the plaintiff had suffered from tuberculosis which necessitated the cessation of his employment in the grocery store and incapacitated him from following this occupation. It is clearly inferable from the evidence that the company ceased to pay the benefits, which it had been paying on account of the plaintiff's total disability to follow his occupation and while he was unemployed, because the plaintiff had gone with the Elks Club and was there receiving $100 per month, which, as claimed by the company, was for services performed for the Elks Club. While it is necessary to examine the evidence to ascertain if it is sufficient to show that the plaintiff was permanently disabled to perform the duties of his occupation during the periods covered by these suits, it is also necessary to inquire whether the duties which he had assumed at the Elks Club were duties of a nature similar to those required of him in his occupation as operator and worker in a grocery store, which was his occupation at the time of the issuance of the policy.

While there was considerable evidence to the effect that the plaintiff had not suffered from tuberculosis, there was evidence to the effect that he had received compensation from the United States government in payment of disability caused by tuberculosis. Dr. Stewart, who had attended the plaintiff as physician for some time and was inferentially well acquainted with his condition, testified as follows: "I believe Mr. Johnson was first my patient about 1928. . . I did examine him for life insurance. I examined him for the Metropolitan. . . I testified in this case when it was tried before. I examined Mr. Johnson last week [the case was being tried on October 9, 1940]. As to whether there was any material change in Mr. Johnson's condition since the last trial of this case—there was not a very noticeable change. He had a little fresh cold that morning he came down, last week. As to whether I examined him at the last trial, August a year ago, I guess I did; I have been examining him about every month. As to whether there has been any material change in his condition for the better, so far as the tuberculosis is concerned, since the last trial—I did not notice any material change; I noticed that he is quiescent. In his present condition he is not, I don't think,

able to do manual labor. I wouldn't advise him to. As to whether he has an arrested case of tuberculosis now—in my opinion it is arrested. . . I say that Mr. Johnson's lung condition is what I call quiescent—I think that is a very good word—I mean by that, subsided but not entirely well. . . My physician findings were based entirely on the stethoscope; physical findings was the extent of my examination. You might like the word 'arrested' better than the word 'quiescent' in describing Mr. Johnson's condition. I can't say how many years this condition has been quiescent; approximately, I would say, at least three years. His condition is improving. I don't think you can get tuberculosis germs from his sputum. I don't think Mr. Johnson could do hard work, hard manual labor. I have known Mr. Johnson for a long time, at least since 1925—before that. . . I don't believe Mr. Johnson is able to do hard manual labor with safety. For a man to do hard manual labor he has got to kind of keep in training for it. He would have to toughen up some. I don't believe that Mr. Johnson could work in a grocery store or load sacks of feed and groceries in a wagon or truck, like he was doing when he bought this insurance. I have seen country stores and am acquainted with the ordinary duties. Loading and unloading heavy sacks of meal and stuff like that—that is just one small part of the duties of a country store operator. His main duties are buying and selling articles of merchandise that do not run into several hundred pounds in weight. One of the main duties of waiting on the ordinary trade is one of making change about twelve hours a day; and keep the customers in good humor and finding out what the customers need and keeping up the stock. Those are his main duties. Lifting of real heavy sacks of meal is a very small part of it. It doesn't come all day long; just in the wholesale. As to outside of doing any real heavy lifting, do I know of any reason why Mr. Johnson couldn't perform the duties of a country storekeeper—well, the inside confinement would be difficult; in our section most of the country stores stay open about twelve hours a day and I don't suspect that he would be able to hold his end of it. They usually have a little help though. Most grocers in our country work for about twelve hours. The general number of hours people work now in a day is eight hours, but that is not true in farming sections. You ask me to state, in my candid

opinion and my honest opinion, that outside of lifting heavy sacks and doing heavy lifting do I know of any reason why Mr. Johnson couldn't perform the duties of a storekeeper or the duties of operating a country store, well, I don't think he could take the confinement and get by with it. As to whether confinement anywhere would be as detrimental as a country store—I don't think so. . . As to whether confinement in a store is more detrimental than anywhere else—he will contact people who are not quite as nice as we are. They will spit on the floor. He would have to sweep and inhale the dust. That would be a part of his duties. I think there are places more healthy than a store. A country store is not as healthy as a city store. It may be that there is more dust. I think, maybe, that the city store would be better on him; with a cleaner clientele. You know that yourself. They don't have as much dirt on their feet; they have better homes to live in. . . As to other than that do I think he would be able to perform substantially all of the duties in a country store—he might be able for a few hours a day, but I don't think he can make a regular hand and get by with it; I mean because of the confinement, without another breakdown. That is my opinion. As to whether I think he would be able to perform substantially the duties of a country grocery store, excluding lifting of heavy 200-pound sacks of meal, I wouldn't advise it, and I don't believe any other doctor would that has watched a fellow with tuberculosis and it had gone to an arrested state. He might get by with it for awhile, but it would finally break him down. I base that opinion on the fact that it is confining and monotonous. He would wait on the ordinary trade a little bit. I base it mainly on the confinement. I don't think he would take it with safety."

We have quoted at length from Dr. Stewart's testimony. While he seemed to convey the idea that the plaintiff could do some of the light work in a grocery store he was clearly of the opinion that he could not do the heavy work. The doctor clearly intimated that the plaintiff could not stand the confinement of a grocery store, and could not devote the full time required to the discharge of the duties which would be required of him in the store. The doctor certainly conveyed the idea that the plaintiff could not do such duties with safety to himself.

Dr. Morris, who testified for the plaintiff, was propounded the

following question: "Suppose in 1928 Mr. Johnson was an able-bodied man, engaged in the business of a general grocery merchant with a country trade, selling feed stuffs by the sack, and had to load sacks and unload sacks, sold hardware and farm implements, and then in 1928 developed tuberculosis and got in the shape you see him in in 1931; would you say it would be wise for him to go back to that kind of work after the tuberculosis became arrested?" The doctor answered: "I would say this: he would take chance with his life in that he might reactivate the tuberculosis and cause it to recur." The doctor further stated: "When tuberculosis is reactivated after it is arrested it is really worse the second time than the first time. Every time he has a return of the active symptoms it gets worse and usually ends in death; but sometimes —I started to say that a man breaks down and recovers two or three times, but that is uncommon. Many doctors, if he once diagnoses tuberculosis in a man, insists that the man follow a certain routine of life for the balance of his life, if he wants to live a long time. . . It is good advice on the part of a doctor to advise a man who has tuberculosis that is arrested to live a quiet life and take care of himself. That is, that would be my advice to this boy." It appears from other evidence that Mr. Johnson's duties at the grocery store were such as were outlined in the question propounded to Dr. Morris.

It is clearly inferable from the evidence of the doctors that the plaintiff was incapacitated, by virtue of his tubercular condition, though arrested, and which had been in existence for a number of years past, including the period covered by the suits here involved, from performing substantially all of the duties required of him in his occupation for and during the period covered by the suits here involved and for which the plaintiff seeks indemnity under the above referred to provision of the policy.

Does it appear conclusively and without dispute that the plaintiff, by reason of his connection with the Elks Club and the duties which he is performing there, is enabled to do substantially the same duties of his occupation at the time of the issuance of the policy, namely, operating and working in a grocery store? It appears from the testimony of Dr. Threadgill that he was at one time exalted ruler of the Elks Lodge at Decatur; that the lodge was organized sometime in the spring of 1936; that he served as

exalted ruler for about two years, and that during this time Mr. Johnson's capacity at the club was that of house manager; that Mr. Johnson's duties were to keep the lodge room in order and cleaned up, and food prepared, and on meeting nights to see that refreshments were served, and to serve drinks and lunches and look after the pool table, and managing generally, and to see that the club was locked up after activities; that Mr. Johnson came around about 11 a. m. and closed the club sometime in the afternoon; that he has seen Mr. Johnson lying down on the couch asleep during the day; that the club frequently closed about six or eight o'clock at night and did not always keep open until eleven o'clock; that Mr. Johnson was one of the organizers of the club; that Mr. Johnson's job was that of supervising; that it did not require "any work;" that there was a cook to do the cooking and another man to help and two other men were there; that there was one or perhaps two colored boys there; that "Mr. Johnson did not have to do any cooking or serving;" that "he was just bossing this negro and checking the groceries for eight or ten people to eat;" that he never saw Mr. Johnson doing anything much; that Mr. Johnson was hired by the club to run that department and was paid for it, and looked after buying supplies for the club and had supervision of running the department, and looked after "the whole works."

The above testimony of Dr. Threadgill was undisputed, and was corroborative of and consistent with the following undisputed testimony of Mr. Johnson himself: Mr. Johnson testified that he did not "work" at the Elks Club but that he stayed there; that he never served any lunches or drinks, but only had charge of the club since the club's organization, which was in November, 1936; that he drew $100 a month; that "they didn't pay" it to him but that he "drew" it out of the Elks Club fund. His testimony was to the effect that he merely supervised and looked after things at the club and did no physical labor; that he has to lie down and take a nap nearly every day. He testified that he drew $100 a month from the club only if the club earned enough to pay him; that when the club was organized he helped organize it; that the trustees told him that all they wanted him to do was to superintend the club and look after it and not do any work; that they didn't know whether they could pay him anything, but for him to go ahead and operate the club and if it made any money they wanted him to

have something to live on out of it; and that is the way the club started operating. He stated that he did not do any actual work. All he did was to superintend the negro, tell the negro what to do, and that Mr. Chambers and Mr. Roy Walker are there most of the time to help him; that physical exercise over several hours causes shortness of breath, exhaustion and headaches; that he has done no physical work of any kind since he developed tuberculosis in 1928.

While it appears that Mr. Johnson received a monthly check from the government in compensation for tuberculosis, and that it was, in his language, "service connected," it does not appear that the disease which caused his disability from work in 1928 arose or occurred before the issuance of the policy which was in 1925. It is inferable that such disease occurred after the issuance of the policy. This could be inferred from the fact that the company, as it appears from the record, had, on account of the disease causing the disability in 1928, voluntarily paid benefits under the policy. It is clearly inferable from the testimony of the plaintiff, as appears on page 45 of the record in this court, that at his occupation of operator and manager of the grocery store, which was his occupation when the policy was issued, he earned in excess of $100 per month—the amount he drew from the Elks Club. It therefore does not appear conclusively, as contended by the company, that the plaintiff is now doing as much as he did at his former occupation.

The defendant insists on exceptions to the exclusion of testimony of Dr. Threadgill to the effect that the club paid Mr. Johnson $100 per month while Dr. Threadgill was exalted ruler and paid $100 a month for his services as house manager for each month during the first two years of the existence of the club, beginning in 1936, while Dr. Threadgill was exalted ruler, and that the club hired Mr. Johnson to run the club and that he was paid for it. The substance of this excluded evidence was at another time admitted in evidence. The only materiality it could possess would be upon the nature of the duties of Mr. Johnson at the club, and it is not inconsistent with the evidence already admitted and referred to above as to his duties being supervisory only. There was no error in excluding this evidence.

The evidence authorized the finding that the plaintiff was totally disabled and entitled to the disability sued for and no error appears. The judge did not err in overruling the certiorari.

*Judgment affirmed. Sutton, J., concurs. Felton, J., dissents.*