30041. MUTUAL LIFE INSURANCE COMPANY OF NEW YORK *v.* BARRON *et al.*

DECIDED DECEMBER 4, 1943.  REHEARING DENIED DECEMBER 20, 1943.

*Grover Middlebrooks, Louis W. Dawson, Beck, Goodrich & Beck,* for plaintiff in error.  *William M. Dallas,* contra.

MACINTYRE, J.  This was a suit on an insurance policy for total-disability benefits by Dr. Henry A. Barron against the Mutual Life Insurance Company of New York.  The policy provided that upon the insured (before reaching the age of 60 years) furnishing the company with proof that he was totally and permanently disabled as provided in said policy, the company would: (1) waive each premium as it thereafter became due during such disability; and (2) pay to the insured monthly benefits of $50 per month for the first 60 months of said disability, $75 per month for the second 60 months of said disability, and thereafter $100 per month during the remaining life of said insured, so long as said disability continued.  The insured furnished the company proof that he was

totally disabled on January 1, 1927. The company waived the premiums, and began the payment of total-disability benefits according to the provisions of the policy, and paid the same continuously until after the February, 1942, payment had been made, when it refused to make further payments.

The rule as to total disability stated in *Cato* v. *Ætna Life Insurance Co.*, 164 *Ga.* 392 (138 S. E. 787), and explained in *Metropolitan Life Insurance Co.* v. *Johnson*, 194 *Ga.* 138 (20 S. E. 2d, 761), is that so long as the insured has capacity to perform any substantial part of his duties, he is not totally disabled. "Total disability is inability to do substantially all of the material acts necessary to the transaction of the insured's occupation, in substantially his customary and usual manner. Total disability does not mean absolute physical inability to work at one's occupation, or to pursue some occupation for wages or gain; but it exists if the injury or disease of the insured is such that common care and prudence require him to desist, and he does in fact desist, from transacting his business. In such circumstances, total disability exists." *Cato* v. *Ætna Life Insurance Co.*, supra. The rule stated in the *Cato* case involved only one occupation, that of a weaver, and that was the occupation at which the claimant in that case was working at the time the disability occurred. More than one occupation is involved in the instant case, to wit: doctor of medicine, chairman of the board of county commissioners, and city councilman. The occupation in which the claimant here was engaged at the time of his total disability (January 1, 1927) was that of a doctor of medicine. His net earnings were $700 to $800 per month. On a showing made by the claimant, in accordance with a provision of the policy, the company waived the premiums, and paid total-disability benefits up to and including the month of February, 1942, after which it discontinued paying on the ground that the plaintiff had recovered to such an extent that he was no longer totally disabled within the provisions of the policy. The question here is, what is the rule where the claimant has recovered from his disability to a named extent, but has not resumed the practice of medicine, the employment in which he was engaged at the time of the occurrence of the total disability. In Keith v. Chicago, B. & Q. R. Co. (82 Neb. 12, 116 N. W. 957, 130 Am. St. R. 655, 23 L. R. A. (N. S.) 352), it is said: "If an injured member of the relief department recovers

to the extent that he is no longer disabled in the performance of the work contemplated or similar work,—that is, employment equally as desirable and remunerative,—then the obligation of the defendant to pay disability benefits ceases." In *Prudential Insurance Company* v. *South,* 179 *Ga.* 653, 658 (177 S. E. 499, 98 A. L. R. 781), the Supreme Court speaking through Mr. Justice Bell stated: "The expressions 'any occupation' and 'any work' were thus converted into words of concrete signification, and should be construed to mean the ordinary employment of the particular person insured, or such other employment, if any, approximating the same livelihood, as the insured might fairly be expected to follow, in view of his station, circumstances, and physical and mental capabilities." While the writer has read a number of foreign cases on this point, the rule in the *South* case, just quoted, appears to him to be the most helpful statement of the law of total disability as it applies to the facts of the instant case; for the explanation in the *South* case of what some decisions call "similar employment," is clearer to the writer than in the other cases read. And when we apply the rule quoted from the *South* case to the instant case, where different kinds of occupations are involved, in order for the insurance company to be justified in refusing to continue the total-disability payments, by merely showing that the insured is engaged in the other occupations, it must appear: (1) that he never became physically able to (nor did he) resume his work as a doctor of medicine; (2) that he engaged in employments which were to him desirable, and as he might be fairly expected to follow in view of his station, circumstances, and mental and physical capabilities; (3) and that the employment produced a like remuneration or approximated the same livelihood. Under the circumstances of this case, it was necessary that the proof show all three of these essentials. The defendant contended that it refused to make total-disability payments after February, 1942, on the ground that after investigation it learned that the insured was not totally and permanently disabled within the policy definition. After verdict, that view of the evidence which is most favorable to the plaintiff must be taken, for every presumption and every inference is in favor of the verdict. The evidence, when so construed, authorized a finding that in 1927 the insured made claim for total-disability benefits, which were paid until February, 1942; that during the period for which the dis-

continued benefits were sued for, he was chairman of the board of county commissioners of Upson County, and had been re-elected for another term of three years; that he had an office in the courthouse, and went there almost every day; that he was performing the duties of chairman of the board of commissioners satisfactorily, and received a salary of $75 per month for his services; that during the period in question, he was also a member of the city council, mayor pro tem, and chairman of the street committee of Thomaston; that he was also performing the duties of those offices satisfactorily and received a salary of $60 per month for his services; and that he was serving on other committees of the city council of Thomaston. The insured testified in part: "I was born on August 4, 1889. I was a practicing physician before I became disabled. I practiced in this county from 1913 to 1927. I did a general practice, a little of everything that a doctor does, and was on duty from 12 to 15 hours a day on up to 24 hours a day. I made an average of seven or eight hundred dollars net a month before I became disabled. I overworked myself and became disabled. . . I made proofs of my disability to the Mutual Life Insurance Company of New York, and they recognized my disability and began to pay me in 1927. They paid me to February 1942, and then they stopped the payments. . . I am a very nervous man. I only get about three or four hours sleep at night. I rest some during the day when I feel bad, that is, I lie down, but I don't sleep during the day time. . . I am very weak to what I was. I can not sleep if I exert myself at all. I stopped the practice of medicine about Christmas time, 1926. I made an average of seven or eight hundred dollars per month. None of my duties connected with the city or county require any physical exertion. My duties do not require me to do anything at any particular time. None of my duties prevent me from resting at any time during the day if I desire to do so. The reason I get up in the night and come up town in my car is because I wake up and can not sleep, and I get tired of lying in bed. The amounts he asked me about that I got from the city and the county is my gross salary. I do not have to do anything at any particular time. If I don't feel like it I don't have to go to the office, and I can absent myself from the city council for the next five weeks if I want to. I do not supervise and oversee the hands in my capacity as street chairman, or as chairman

of the street committee. I tell Chief Rogers, the chief of police, what to do and he has charge of the street hands. If you were to report to me that the street you live on was in need of repairs, the only exertion I would have, would be to pick up the telephone and call Chief Rogers. I could do all of that sitting at home or in bed. If I had a report from somebody living out in the county as to any road, I could attend to it by sitting in a chair at my home and telephoning the camp, and have it fixed that same day. I would not know whether it was fixed right or not if I went out there, because I am not an engineer, and I do not supervise the actual work. The warden does most of the riding that is required of the county commissioners. The other two commissioners do a great deal of riding over the county, looking after the county's affairs." Notwithstanding the conflicting evidence, particularly that of the doctor's, the jury were authorized to find, that at the time the insurance company ceased paying the disability benefits, the claimant was totally disabled according to the provisions of the insurance policy, under the rules stated in the *Cato* and the *South* cases. Irrespective of whether the insurance company proved the first two essentials stated above, it failed to prove the third, to wit: that the employment produced a like remuneration or approximated the same livelihood. The jury were authorized to find from the evidence as a whole that at the time of the disability, the claimant was making $700 to $800 net per month, as a doctor of medicine, and that at the time the company ceased paying the compensation benefits, the insured, as a member of the board of county commissioners and as a member of the city council, was making only $135 per month, which was less than one-fifth of the remuneration he was receiving at the time of the disability. Under the rules in force in this State, as announced in the *Cato* and *South* cases, the verdict finding that the insured was totally disabled as alleged was authorized.

■ Under the foregoing ruling the following charge, to wit: "The words 'total disability' mean inability to do substantially or practically all of the material acts necessary to the transaction of the insured's business, or his occupation, or whatever line he is following, and in the customary and usual manner," is not reversible error, because "it in effect instructs the jury that recovery should be had even though his disability is only partial and not total. It instructs the jury that recovery should be had unless the insured is

able to follow his usual occupation, regardless of whether or not any other occupation is open to him." This charge, if error, is not reversible error as against the plaintiff in error, the complaining party. The charge did not limit "whatever line he is following" to one approximating the same livelihood. Thus, under the *South* case, supra, the error, if any, was favorable to the defendant, as it in effect instructed the jury that, if the insured was then following any line of endeavor, he would not be totally disabled unless he was unable to do substantially or practically all the material acts necessary to the transaction of said line of work or endeavor. Under this charge the jury was in effect instructed that if the insured was following the line of selling pencils "in the customary and usual manner," he could not be totally and permanently disabled.

■ There are other exceptions in the record but we think that the foregoing rulings cover all exceptions made.

■ The term "bad faith," as used in the Code, § 56-706, is not the equivalent of actual fraud, but means any frivolous or unfounded refusal in law, or in fact, to comply with the requisition of the policyholder to pay according to the terms of his contract and the conditions imposed by statute. *Cotton States Life Ins. Co.* v. *Edwards*, 74 *Ga.* 220 (4). We do not think the evidence authorized a finding in the instant case that the insurance company's refusal to pay was in "bad faith."

■ As the verdict against the insurance company was authorized by the evidence, and no material error was committed which affected the plaintiff's right to recover, the judgment is affirmed on condition that the plaintiff write off the sums recovered as a penalty and attorney's fees; otherwise the judgment is reversed.

*Judgment affirmed on condition. Gardner, J., concurs. Broyles, C. J., dissents.*

BROYLES, C. J., dissenting. In my opinion the evidence demanded a finding that Dr. Barron was only partially disabled and was gainfully employed at the time the insurance company refused to continue payment of the total-disability benefits; and that the verdict in favor of the plaintiff was contrary to law and the evidence.

### ON MOTION FOR REHEARING.

In its motion for a rehearing, the plaintiff in error contends that "the fact that at the time the contract of insurance in this case was

issued in 1925, the only decisions of the appellate courts of Georgia construing the words 'total and permanent disability' were the decisions in the cases of *Whitton* v. *American National Insurance Co.*, 17 *Ga. App.* 525 (87. S. E. 827), decided in 1916, and *Parten* v. *Jefferson Standard Life Insurance Co.*, 30 *Ga. App.* 245 (117 S. E. 772), decided in 1923, both holding that such disability-benefit provisions will be construed as expressed, and that insured is not entitled to disability benefits if it appears that he is not wholly unable to earn or obtain any wages for compensation for profit;" and that the policy in question having been executed between the time of the rendition of the decision of the Court of Appeals in the *Whitton* case, and the time of the contrary decision in the case of *Cato* v. *Ætna Life Insurance Co.*, 164 *Ga.* 392 (supra), it must be assumed that in this intermediate stage, the law of the *Whitton* case was the law to be applied to the instant case, and that it was mandatory on the court below so to apply it.

The case of *Cato* v. *Ætna Life Insurance Co.*, supra, decided June 23, 1927, dealt with an insurance policy that was issued on April 10, 1920. The Supreme Court held: "Total disability is inability to do substantially all of the material acts necessary to the transaction of the insured's occupation, in substantially his customary and usual manner. Total disability does not mean absolute physical inability to work at one's occupation, or to pursue some occupation for wages or gain; but it exists if the injury or disease of the insured is such that common care and prudence require him to desist, and he does in fact desist, from transacting his business. In such circumstances, total disability exists." Since that time the Court of Appeals has followed the *Cato* case in many cases, and the Supreme Court, whenever the question of total disability has reached them, by certiorari from the Court of Appeals, or otherwise, has uniformly held to the decision in the *Cato* case. In *Parten* v. *Jefferson Life Insurance Co.*, supra, it was said: "In the application for this insurance it is stated that 'any policy issued under this application shall be governed by the laws of the State of North Carolina.'" The rule in such a case under the laws of the State of North Carolina is different from the rule in Georgia as stated in the *Cato* case, and in all the cases decided both by the Supreme Court of Georgia and the Court of Appeals of the State since June, 1927, when the *Cato* case was decided. However, the

*Parten* case does cite the case of *Whitton* v. *American National Life Insurance Co.,* supra.

The plaintiff in error, in its motion for a rehearing, seems to rely strongly on the case of *Heist* v. *Dunlap,* 193 *Ga.* 462 (18 S. E. 2d, 837), which decides an issue raised as to two different contrary interpretations of a statute by the Supreme Court. We think the only unequivocal holding contrary to the decision of the Supreme Court in the *Cato* case, is the early decision of the Court of Appeals in the *Whitton* case. It might be noted that the Constitution of Georgia states that "the decisions of the Supreme Court shall bind the Court of Appeals as precedents." Code, § 2-3009. The question here is as to what effect the decision of the Supreme Court in the *Cato* case (followed by a long line of supporting cases both in the Supreme Court and the Court of Appeals) is to be given to a policy of insurance written prior to the *Cato* case and subsequent to the decision of the *Whitton* case, which was overruled by the *Cato* case.

Out of the age-old discussion as to the effect to be given these decisions there have been developed two fundamentally opposing theories. According to one theory the decisions of the courts are always conclusive evidence of what the law is. According to the other theory the decisions are evidence, but not conclusive evidence of the law. "Salmond, in his work on Jurisprudence (8th ed.), p. 197, in discussing the retrospective effect of a later decision said: 'The overruling of a precedent is not the abolition of an established rule of law; it is an authoritative denial that the supposed rule of law has ever existed. The precedent is so treated not because it has made bad law, but because it has never in reality made any law at all. It has not conformed to the requirements of legal efficacy. Hence it is that the overruling of a precedent, unlike the repeal of a statute, has retrospective operation. The decision is pronounced to have been bad ab initio. A repealed statute, on the contrary remains valid and applicable as to matters arising before the date of its repeal. The overruling of a precedent is analogous not to the repeal of a statute, but to the judicial rejection of a custom as unreasonable or as otherwise failing to conform to the requirements of customary law." People *v.* Graves, 242 App. Div. 128 (273 N. Y. Supp. 582). If rights are acquired under a construction of a statute which is impliedly written in the contract in question, the

statute becomes a part of the contract, and must govern the rights of the parties as against a different construction thereafter adopted by overruling the former decision. Such seems to be the rule applied in *Heist* v. *Dunlap, supra*. A judicial construction of the statute becomes a part of the statute, and as to rights which accrue afterwards, it should be adhered to for the protection of those rights. To divest them by a change of the constitution is to legislate retroactively.

Chancellor Kent, in commenting upon the rule of stare decisis, said that "it is probable that the records of many of the courts of this country are replete with hasty and crude decisions; and in such cases are to be examined without fear and revised without fear and revised without reluctance rather than to have the character of our law impaired and the beauty and harmony of the system destroyed by the perpetuity of error." 1 Kent's Commentaries (13 ed.), 477. In Butler *v.* Van Wyck, 1 Hill (N. Y.) 438, 462, the court said: "It is going quite too far to say that a single decision of any court is absolutely conclusive as a precedent. It is an elementary principle, that an erroneous decision is not bad law—it is no law at all. It may be final on the parties having rights depending upon the same question." The general principle is that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation, and the effect is not that the former decision is bad law, but that it never was the law. To this the courts have established the exception that where a constitutional or statute law has received a given construction by the courts of last resort and contracts have been made and rights acquired under and in accordance with such construction, such contract may not be invalidated, nor vested rights acquired under them be impaired by a change of construction made by a subsequent decision.

The general rule as to the effect of reversal, or the overruling of earlier decisions, is as follows: "The overruling of a decision generally is retrospective and makes the law at the time of the overruled decision as it is declared to be in the last decision. The overruled decision as a precedent is thereby destroyed, but it remains the law of the particular case in which it was rendered." 21 C. J. S. 326, § 194. But there is an exception to the general rule, to wit: "An overruling decision can not operate retrospectively so as to impair the obligations of contracts entered into, or injuriously affect

vested rights acquired, in reliance on the overruled decision." 21 C. J. S. 328, § 194. The State court may make a choice for itself between the principle of forward operation and that of relationship backwards. And as was stated by Mr. Justice Cardozo in the case of Great Northern R. Co. v. Sunburst Oil & Ref. Co., 85 A. L. R. 250, 260, "It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions. Indeed there are cases intimating, too broadly (cf. Tidal Oil Co. v. Flanagan, 263 U. S. 444, 44 S. Ct. 197, 68 L. ed. 382, supra), that it *must* give them that effect; but never has doubt been expressed that it *may* so treat them if it pleases, whenever injustice or hardship will thereby be averted." In 21 C. J. S. 326, § 193, it is said "that the rule of stare decisis, stated in simple form and considered with relation to its effect on private affairs, is really nothing more than the application of estoppel to court decisions." Although it does not appear from the records that the exact question in issue here was raised in them, there are at least four cases which have been decided by the appellate courts of Georgia, based on an insurance policy in which there was a provision for total disability similar to the provision in the policy in the instant case. All of the policies in these four cases were issued during the intermediate period between the *Whitton* and the *Cato* cases, but were decided after the *Cato* case. In each of the cases the Court of Appeals applied the principle stated in the *Cato* case. These four cases are: *Mutual Life Insurance Co.* v. *Childs,* 64 *Ga. App.* 658 (14 S. E. 2d, 165), in which the policy involved was issued on November 26, 1926; *Metropolitan Life Ins. Co.* v. *Johnson,* 66 *Ga. App.* 520 (18 S. E. 2d, 35), in which the policy involved was issued in 1925 (affirmed on certiorari in 194 *Ga.* 138) ; *Metropolitan Life Ins. Co.* v. *Daniel,* 64 *Ga. App.* 620 (13 S. E. 2d, 741), in which the policy involved was issued in October, 1925 (certiorari was denied). It might be noted that the plaintiff in error in the first of the cases just above mentioned was the same company as the plaintiff in error in the instant case. There are many other cases decided since the *Cato* case, by both this court and by the Supreme Court, all of which have followed the *Cato* case, which, in effect, had overruled the *Whitton* case. Thus the *Whitton* case seems to have been the single case in the Court of Appeals and the Supreme Court that is contrary to the *Cato* case. We do not feel authorized to say that the

court below erred in not applying the doctrine of estoppel to the court decision not only in the *Cato* case but in all the many cases that have followed the principle therein stated, which is but another way of saying that the court was authorized in saying that the doctrine of stare decisis should not be applied in the present case.

This and all other matters in the motion having been considered, the motion for rehearing is denied.

*Rehearing denied.   Broyles, C. J., and Gardner, J., concur.*